UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 5:22-cr-00121 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Carmen E. Henderson |
| JEREMY HINSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPINION AND ORDER**

Defendant Jeremy Hinson, a transgender person also known as Alexia Conner, moves to suppress evidence federal agents obtained from her cellphone while executing a search warrant. The warrant at issue authorized federal agents to compel Ms. Conner to use biometrics to unlock the phone. However, it did not authorize them to request a password or other means for accessing the device. These terms of the warrant implicate the Fourth and Fifth Amendment in an emerging area of the law that has divided the lower courts. *See In re Search of a White Google Pixel 3 XL Cellphone in a Black Incipio Case*, 398 F. Supp. 3d 785, 790 (D. Idaho 2019).

Defendant seeks to suppress the evidence resulting from a search that occurred after agents accessed her cell phone using means the warrant did not authorize. Although agents exceeded the scope of the warrant in this regard, the United States argues that Defendant consented to the search. Alternatively, the United States argues that the exclusionary rule does not require suppression because discovery of

the evidence at issue was inevitable. For the reasons explained below, the Court **DENIES** the motion to suppress.

## STATEMENT OF THE CASE

On November 17, 2021, a United States Magistrate Judge issued a warrant to search Defendant and her home and to seize certain property, including her cell phone. (ECF No. 26-1, PageID #207). Federal agents executed that search the next day. (ECF No. 26-2, PageID #213.) On March 11, 2022, a grand jury returned an indictment charging Defendant with three counts involving child pornography. (ECF No. 1.) The United States arrested Defendant on April 20, 2022. (ECF No. 6.) Arguing that federal agents exceeded the permissible scope of the search warrant, Defendant seeks to suppress the evidence obtained from her cellphone. (ECF No. 25.) The United States opposes the motion. (ECF No. 26.) At the Court's request, the United States provided the Court with a recording of the interview of Defendant. (ECF No. 28.) On June 22, 2023, the Court heard oral argument and took the motion under advisement.

Both parties accept as accurate the report of the investigation that the Department of Homeland Security prepared. (ECF No. 26-2.) Additionally, counsel agree that the videotaped interview of Defendant, which captures the events at issue and the conversation between Defendant and two DHS agents, is part of the record. The Court reviewed that audio-video recording, which largely corroborates the report but contains some additional relevant details. (ECF No. 26-2, PageID #214.) As a

result, an evidentiary hearing is unnecessary to rule on the pending motion. (*See* ECF No. 27, PageID #223 n.1.)

## FINDINGS OF FACT

An undercover DHS agent joined an online chat room dedicated to the distribution of child pornography and discovered a user responsible for uploading some 147 files of such content. (ECF No. 26-2, PageID #213.) DHS suspected that Defendant was that user. (*Id.*)

### A. The Warrant

The United States obtained a warrant to search Defendant and her home and to seize electronic devices and certain content on them. (ECF No. 26-1.) The warrant authorized a daytime search to occur between November 17 and December 1, 2021. (*Id.*, PageID #207.) Further, it called for the seizure of several items that might contain evidence of child pornography, including laptops, tablets, cellphones, cameras, electronic storage devices, video tapes and recorders, computer software, computer passwords, and other records. (*Id.*, ¶¶ 1–8, PageID #210–12.)

The warrant authorized law enforcement "to compel [Defendant] to provide biometric features" to access devices that unlock with facial or fingerprint recognition, if done "to search the contents as authorized by this warrant." (*Id.*, ¶ 9, PageID #212.) Critically, the warrant "d[id] *not* authorize law enforcement personnel" to ask Defendant to "state or otherwise provide the password or any other means that may be used to unlock or access the computer devices" subject to the warrant. (*Id.* (emphasis added).) This limitation in the warrant extended to asking Defendant to identify "the specific biometric characteristics (including the unique

3

finger(s) or other physical features) that may be used to unlock or access the computer devices." (*Id.*) In relevant part, the warrant provides:

> During the execution of the search warrant, law enforcement personnel are also specifically authorized to compel [Defendant] to provide biometric features, including pressing his fingers (including thumbs) against and/or putting his face before the sensor, or any other security feature requiring biometric recognition . . . . for the purpose of attempting to unlock the computer device's security features in order to search the contents as authorized by this warrant.
>
> \*     \*     \*
>
> Further, this warrant does not authorize law enforcement personnel to request that [Defendant] state or otherwise provide the password or any other means that may be used to unlock or access the computer devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the computer devices.

(*Id.*)

DHS agents executed the search warrant and seized Defendant's cellphone, a Samsung Note 10+ with service on the Verizon Wireless network. (ECF No. 26-2, PageID #213 & #216.) The phone was password protected. Unlocking it required tracing a designated pattern or using fingerprint recognition (a biometric feature). (*Id.*, PageID #215.)

### B.     Interview of Defendant

As the search commenced, Defendant agreed to speak with law enforcement. (ECF No. 26-2, PageID #214.) For nearly 90 minutes, two DHS agents questioned Defendant in an interview room within a mobile forensic vehicle of the Ohio Internet Crimes Against Children Task Force. (*Id.*) The record shows that the interview room is situated in the rear of a modified trailer and has a table with bench seats on either

4

side and an exit door accessible immediately to the right of the subject's seat. Overall, the tenor of the interview was conversational; the agents mixed small talk with questions about Defendant's online activity. They advised Defendant that she was not under arrest and free to leave. (ECF No. 26-2, PageID #214–15.) The record confirms that Defendant understood each point.

During the interview, Defendant sat near the exit. She had a clear and unobstructed path—just a few steps—if she wished to leave. (*Id.*, PageID #214.) One agent informed Defendant that she was "free to leave the interview room at any time" and, by opening the exit door, showed her the way out. (*Id.*) Agents provided Defendant a copy of the search warrant, resulting in noticeable nervousness as she paged through it. (*Id.*)

Defendant voluntarily conversed with the agents. As she reviewed the warrant and read its contents, Defendant exclaimed, "Oh my God!" Pointing to a reference in the warrant to child pornography, Defendant volunteered that she had a friend who used her phone and that she later discovered and "immediately erased" a photograph of a "little girl." (*Id.*) Defendant offered to tell the agents "exactly who and how it got there." (*Id.*) Further, she volunteered: "I'm on this app, called Kik"; "I'm not a pedophile," and strongly opposed such material. (*Id.*, PageID #215.)

Approximately five minutes and twenty seconds into the video of the interview, agents advised Defendant that they seized her cell phone and stated, "within the warrant, we're going to need to look through that." Defendant briefly acknowledged

5

the statement, and an agent asked, "How do you unlock your phone?" Without hesitation, Defendant described the pattern used to unlock the phone.

At this point, Defendant added, "I will tell you, I have bestiality [on my phone]." Then, in her nervousness, Defendant realized that she provided incorrect information to unlock the phone. After taking a moment to regain her composure, approximately six minutes and twenty seconds into the video, Defendant corrected herself and identified the pattern she thought would open the phone. An agent asked whether a passcode or number sequence would also open the phone, and Defendant answered that question in the negative but indicated that a biometric marker (a fingerprint) would.

The agents did not give the phone to Defendant to unlock with her finger or by using another biometric marker. Instead, they provided Defendant with blank paper and asked if she would draw the pattern used to unlock the phone. Defendant demurred, and agents moved on to other topics. At one point, approximately 37 minutes into the interview, Defendant asked if she could have her phone back. Agents responded, "Provided we get in there because, I think you may have seen the warrant. I think that's probably the main thing we need to search." Earlier, agents told Defendant that they did not want to seize the phone and leave her without one for an extended period of time.

During the course of the interview, Defendant stated that she administers several chatgroups on the platform Kik, including groups devoted to bestiality and nudity. (*Id.*, PageID #216.) Defendant acknowledged that "people associate bestiality

6

with [child pornography]" and admitted to seeing child pornography in Kik chatrooms on roughly "a dozen" occasions. (*Id.*, PageID #219.) When asked if she was familiar with the Kik username associated with uploading 147 files of minors, Defendant answered: "I remember the name and picture," but it does not "hold any significance to me other than that though." (*Id.*, PageID #218.)

Throughout the interview, Defendant expressed her desire to cooperate. She noted that others sometimes used her phone and named three particular acquaintances who had recently done so. (*Id.*, PageID #217, #219–20 & #221.) Defendant referenced applications on her phone with which she was unfamiliar—she did not know what they do or how they got there. (*Id.*, PageID #219.) Nearly 48 minutes into the interview, the agents informed Defendant that other investigators were going through her phone at that moment, to which she responded, "I figured." When asked whether agents would find "any illicit content" on her cellphone, Defendant answered, "I have no idea. To my knowledge, . . . no. If there is, it would most likely" be one of two other particular people responsible. (*Id.*, PageID #217.) Defendant anticipated that the agents would find "[b]asic porn videos, some nude pictures of other people, pictures of my [body], . . . and some bestiality porn." (*Id.*, PageID #217.) Before the end of the interview, when asked, Defendant admitted to sharing child exploitation material on Kik "once or twice" by "complete accident." (*Id.*, PageID #220–21.)

Initially, Defendant declined the agents' invitation to take a polygraph because she did not want to go to the police station. Though not captured on video, the DHS

7

report states that Defendant subsequently consented to a voluntary polygraph test, which in the end she was ineligible to take. (*Id.*, PageID #221.) The recording of the interview concludes with Defendant asking the agents to return her cellphone, a request the agents could not accommodate, and exiting the interview room to smoke a cigarette. (*Id.*)

## GOVERNING LEGAL STANDARD

The Fourth Amendment prohibits the government from conducting "unreasonable searches and seizures." U.S. Const. amend. IV. Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

To deter infringements on the rights that the Fourth Amendment secures, the exclusionary rule excludes from trial evidence gathered from an unlawful search. *Utah v. Strieff*, 579 U.S. 232, 237 (2016). However, this "judge-made remedy" "does not extend . . . to all Fourth Amendment violations." *United States v. Robinson*, 63 F.4th 530, 534 (6th Cir. 2023) (citing *Hudson v. Michigan*, 547 U.S. 586, 591–92 (2006)). Rather, the exclusionary rule contains exceptions that, if they apply, permit the use of evidence collected in contravention of the Fourth Amendment. *Utah*, 579 U.S. at 238.

## CONCLUSIONS OF LAW

Defendant argues that the search of her cellphone exceeded the scope of the warrant and violated her protection under the Fourth Amendment against

8

unreasonable searches. U.S. Const. amend. IV. Here, the warrant expressly authorized a search of Defendant's phone. (ECF No. 26-1, PageID #210.) It specified a way for agents to access the phone and authorized agents to compel Defendant to input biometric features to unlock the device. (ECF No. 26-1, PageID #212.) Investigators did not do so. Instead, they accessed the phone by asking Defendant the password or, more accurately, the pattern used to unlock or access the device—a manner the warrant expressly "d[id] not authorize." (*Id.*)

### I. Violation of the Warrant

Defendant begins her argument for suppression by attacking the reasonableness of the execution of the warrant. After all, the warrant expressly "does not authorize law enforcement personnel to request that [Defendant] state or otherwise provide the password or any other means that may be used to unlock or access" the cellphone at issue. (ECF No. 26-1, PageID #212.) For its part, the United States contends that the warrant did not restrict agents from obtaining access to Defendant's phone through other lawful means. (ECF No. 26, PageID #200.) But this position asks the Court to downplay or ignore the express limitation on the face of the warrant.

Whatever the origin of the warrant's express disclaimer of authorization to access Defendant's phone, though it does not appear that it originated with the Magistrate Judge (*see* ECF No. 35, PageID #252), the record leaves no doubt that agents exceeded the authorization of the warrant. Defendant argues that this fact ends the inquiry. "The Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant, in order to assure that those

9

searches deemed necessary remain as limited as possible." *Dalia v. United States*, 441 U.S. 238, 260 (1979) (internal quotation marks and alterations omitted); *see also, e.g.*, *United States v. Watson*, 63 F. App'x 216, 220 (6th Cir. 2003). "[C]ompliance with the limitations of a warrant is required by the Constitution itself." *Jones v. Kirchner*, 835 F.3d 74, 84-85 (D.C. Cir. 2016). Indeed, the Supreme Court cautions that "the Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 394–95 n.7 (1971). Flagrant disregard of a warrant's limitations risks an invalid general search and violates the Fourth Amendment. *United States v. King*, 227 F.3d 732, 751 (6th Cir. 2000) (citing *Brindley v. Best*, 192 F.3d 525, 531 (6th Cir. 1999)).

Even under these principles, the test for determining whether execution of the warrant violates the Fourth Amendment turns on reasonableness, *see id.*, as Defendant acknowledges, (ECF No. 25, PageID #178). "The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted). "In the context of searches of electronic devices, . . . the methodology of a search matters in determining whether it is constitutionally reasonable." *United States v. Rarick*, 636 F. App'x 911, 916 (6th Cir. 2016). Here, the warrant confirms probable cause for a search of the phone at issue. Whether agents executed the search reasonably, within the meaning of the Constitution, when they went outside the methods authorized for accessing Defendant's phone presents a different question.

10

Reasonableness depends on "the actual circumstances" "as of the time" of the search. *Richards v. Wisconsin*, 520 U.S. 385, 395 and n.7 (1997); *United States v. Richards*, 659 F.3d 527, 538 (6th Cir. 2011). Without question agents knew that the warrant did not authorize them to seek access to Defendant's phone by requesting a password or other means of access, but they did so anyway. Repeatedly. These facts make reliance on the good-faith exception of *United States v. Leon*, 468 U.S. 897, 905 (1984), unavailable, and the United States does not argue otherwise. *See, e.g.*, *United States v. Pimentel*, 26 F.4th 86, 91 (1st Cir. 2022) ("[S]earches clearly exceeding the scope of an unambiguous warrant cannot be saved by the good-faith exception."). These facts also make a showing of reasonableness difficult.

Contrary to Defendant's claim, however, "exceeding the scope of a search warrant does not automatically render" the search unreasonable. *United States v. Blomquist*, 976 F.3d 755, 760 (6th Cir. 2020); *see also United States v. Nicholson*, 24 F.4th 1341, 1351 (11th Cir. 2022) ("Although the government did not comply with the temporal limitation in the magistrate judge's order, we cannot say that this failure rises to a Fourth Amendment violation."). Ultimately, the Court need not determine whether the agents reasonably executed the warrant because resolution of Defendant's motion rests on other grounds.

**II.     Consent to Search**

Consent provides another basis for a lawful search. *See, e.g.*, *United States v. Parrish*, 942 F.3d 289, 294 (6th Cir. 2019). "[T]here is nothing constitutionally suspect in a person's voluntarily allowing a search." *Schneckloth v. Bustamonte*, 412 U.S. 218, 243 (1973). Accordingly, consensual searches may be warrantless. *See*

11

*Fernandez v. California*, 571 U.S. 292, 306 (2014). This rule is "well[] settled." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc) (citing *Davis v. United States*, 328 U.S. 582, 593–94 (1946)). As an example, in *Blomquist*, officers went beyond the geographical limits of the warrant, but the defendant's "Fourth Amendment rights were not violated" because he "consented to the search." 976 F.3d at 760.

Consent moderates the tension between "the legitimate need[s]" of law enforcement "and the equally important requirement of assuring the absence of coercion." *Schneckloth*, 412 U.S. at 227. To waive "Fourth Amendment rights by consenting to a search," the individual must give consent "freely and voluntarily." *Carter*, 378 F.3d at 587. To determine whether a person consents to a search, courts examine (1) whether the "individual's actions adequately demonstrate[] consent"; and (2) if so, if "other factors contaminated that consent." *Blomquist*, 976 F.3d at 759 (internal quotation marks and citation omitted). These are questions of fact. *Schneckloth*, 412 U.S. at 227; *Blomquist*. 976 F.3d at 758.

### II.A. Actions Demonstrating Consent

First, the Court asks whether Defendant gave consent to the search through "words, gesture, or conduct." *Carter*, 378 F.3d at 587. This inquiry broadly examines the facts and circumstances and relevant considerations such as "the characteristics of the person being interviewed—age, education, intelligence." *Parrish*, 942 F.3d at 294 (citing *Schneckloth*, 412 U.S. at 226 (collecting cases)).

Here, the record shows that an agent informed Defendant that the search of her home yielded a phone. (ECF No. 26-2, PageID #216.) The agent asked her how

to unlock the phone. (*Id*.) Defendant explained how to do so by tracing with her finger the pattern of the code. (*Id*.) Later, she verbally clarified that the unlocking pattern is a "backwards seven." (*Id*., PageID #215.) Defendant's answers furnished access to the phone.

Unmistakably, the agents' series of questions and remarks left no doubt that they planned to access and then search the phone if Defendant gave the password. Therefore, Defendant's answer to the question about how to access the phone provided consent to search her phone. Confirming this fact, an agent later explained that "[agents are] going through your phone right now," and Defendant responded not with any sort of objection but by listing the contents they might find. (ECF No. 26-2, PageID #219.)

Additionally, the agents provided Defendant with a copy of the warrant and advised her that she was not under arrest and free to leave. (ECF No. 26-2, PageID #214–15.) Although the interview lasted approximately 90 minutes, this was not a circumstance where investigators wore down their target or tricked her into consenting. Indeed, the critical exchanges about how to access the phone occurred in the opening minutes of the interview.

Based on the record as a whole, the Court finds that Defendant consented to the search of her phone through her words, conduct, and gestures. *See Blomquist¸* 976 F.3d at 759; *Carter*, 378 F.3d at 587. Indeed, at argument, Defendant conceded that the facts and circumstances do not support an argument that Defendant did not consent to the search.

13

### II.B. Contamination of Consent

Second, the Court asks whether Defendant's consent was effective—that is, given all the circumstances, whether it was truly "free and voluntary" and not "contaminated" or coerced. *Blomquist*, 976 F.3d at 758 (internal quotation marks and citation omitted); *Parrish*, 942 F.3d at 294.

### II.B.1. Coercion

The Supreme Court has remarked that the concept of voluntariness is "an amphibian," meaning that it will not look the same in each case. *Schneckloth*, 412 U.S. at 224 (citation omitted). Voluntariness depends on whether consent is "the product of an essentially free and unconstrained choice by its maker." *Id.* at 225. To answer that question, courts consider "the totality of all the circumstance" without a "single controlling criterion." *Id.* at 226–27. Often the inverse of voluntariness—coercion—is more readily apparent, and coerced searches are not consensual. *See Bumper v. North Carolina*, 391 U.S. 543, 550 (1968).

To meet this standard, the United States must show "more than acquiescence to a claim of lawful authority" to conduct the search. *Id.* at 548–49. But the "assertion of authority to act" alone does not render consent coerced; it is just one factor to consider when deciding "whether consent was voluntary." *Parrish*, 942 F.3d at 294. Additional relevant considerations include "the circumstances of the situation, like whether the police told [the defendant] about his constitutional rights, how long the interview lasted, and whether police asserted authority to take the action regardless of consent, how long the interview lasted." *Parrish*, 942 F.3d at 294 (citing

14

*Schneckloth*, 412 U.S. at 226 (collecting cases)); *Harris v. Klare*, 902 F.3d 630, 639 (6th Cir. 2018).

### II.B.2. Application to the Record

When looking to all the circumstances under which Defendant gave the password or pattern to access her phone, an important fact stands out—the agents allowed Defendant to review the warrant. (ECF No. 26-2, PageID #214.) The video of the interview shows Defendant looking through (and presumably reading or at least skimming) each page. Regarding what it authorizes and restricts, the warrant is not lengthy or confusing. Clearly, the warrant did not authorize agents to ask Defendant for her password (or other means of access), but it did authorize using biometric features to open the phone. (ECF No. 26-1, PageID #207.)

Defendant chose to respond to questions from the agents and assist them in their investigation. She answered questions about her online activity, including about the most personal, embarrassing, and potentially illicit content. (ECF No. 26-2, PageID #217 & #220–21.) When Defendant grew nervous, the agents encouraged her to breathe and reminded her that she was not under arrest. Defendant emphasized that she finds child pornography so repugnant that it "makes [her] stomach turn." (*Id.*, PageID #219.) She disclaimed knowledge of any such content on her phone and identified others with access to her phone who might be responsible for any such content. Although nervous, Defendant remained calm and collected. She displayed that control when she hypothesized that another person might be responsible for any contraband on her phone. She explained that this third party had used her phone and associated with younger females. Even then, Defendant carefully and

15

deliberately avoided describing those females as underaged. That exchange occurred in the fifth minute of the interview, seconds before she disclosed her password.

Neither agent dressed in uniform, though the recording shows that one agent wore a badge and holstered gun on her hip. This and the few other facts that might provide some basis for an argument undercutting Defendant's consent fail to overcome the weight of the record showing that her consent was not contaminated. The interview was "conducted in a cooperative spirit." *Parrish*, 942 F.3d at 294. The two interviewing agents were conversational and polite throughout, never overbearing or demanding. Although the agents exceeded the scope of their authorization under the warrant to use particular means to access the phone, they did not mislead Defendant about the need to search her phone. Nor did they convey in word or deed "a message that compliance with their requests is required." *Florida. v. Bostick*, 501 U.S. 429, 435 (1991). In all, nothing "subtly coerc[ed]" Defendant's consent to the search of her phone. *Schneckloth*, 412 U.S. at 229.

Moreover, Defendant was not seized or questioned as part of a custodial interrogation; she spoke with agents of her own volition. After being advised that she was not under arrest and free to leave (ECF No. 26-2, PageID #214–15), Defendant spoke with investigators and answered their questions. "'[K]nowledge of a right to refuse'" is "highly relevant" to evaluating consent. *United States v. Mendenhall*, 446 U.S. 544, 558 (1980) (quoting *Schneckloth*, 412 U.S. at 234). In fact, at times in the interview (well after investigators asked for her password), Defendant declined to answer some questions. *See Bostick*, 501 U.S. at 438 (considering under the Fourth

16

Amendment whether the individual "would have felt free to decline the officers' requests or otherwise terminate the encounter").

At bottom, execution of the warrant here involved "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." *United States v. Drayton*, 536 U.S. 194, 204 (2002). It also included agents advising Defendant that she was not under arrest and free to leave.

Based on all these circumstances, and the record as a whole, the Court cannot find that consent was "granted only in submission to a claim of lawful authority." *Schneckloth*, 412 U.S. at 233. Nor does the record show contamination of Defendant's consent. She "sized up the situation, decided [she] was best off cooperating, and consented to the search." *Blomquist*, 976 F.3d at 760. She appeared to believe that her consent would be exculpatory, not incriminating. "A warrantless search is reasonable if police obtain the voluntary consent of a person authorized to give it." *Georgia v. Randolph*, 547 U.S. 103, 128 (2006) (Roberts, C.J., dissenting). This rule applies to the reasonableness of the execution of a warrant and makes access to the phone here voluntary and lawful.

## CONCLUSION

Because the Court finds that Defendant consented to the search of her phone, it denies her motion to suppress. (ECF No. 25.) This disposition obviates the need to address the other issues and arguments that the parties advanced.

**SO ORDERED**

Dated: July 7, 2023

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio

18